UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHELLE K. SAVU, MD | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL NO. 5:18-cv-00993-JKP |
| | § | |
| ROBERT WILKIE, SECRETARY | § | |
| UNITED STATES DEPARTMENT OF | § | |
| VETERANS AFFAIRS; MIGUEL H. | § | |
| LAPUZ, M.D.,ACTING PRINCIPLE | § | |
| DEPUTY UNDERSECRETARY | § | |
| FOR HEALTH | § | |
|     Defendant. | § | |

**DR. MICHELLE SAVU'S OPENING BRIEF**

Respectfully Submitted

*/s/ Adriaan Jansse, MD, JD*
Adriaan T. Jansse, MD, JD
SBN: 24043740
JANSSE LAW
P.O. Box 791215
San Antonio, Texas 78279
Tel: (210) 460-2135
Fax: (210) 460-1947
*Attorney for Michelle Savu, MD*

1

**TABLE OF CONTENTS**

Page

Statement of Jurisdiction   …………………….………….…………….....   3

Statement of the Case   ……………………………….…………….   3

Issues Presented   …………………………….………….…………….…..   8

Argument   ………………………………………………………………   9

Conclusion   …………………………………………….…………...   23

Prayer ………………………………………………………………....   24

Certificate of Service …………………………………………….……   25

STATEMENT OF JURISDICTION AND VENUE

1.      This Court has Original Jurisdiction over this matter pursuant to 28 U.S.C. §1331. And the Court has Jurisdiction to review final orders of the VA pursuant to 38 USCA §7462(f)(1); the Administrative Procedure Act, 5 U.S. Code §701-706 and the Back Pay Act 5 USCA §5596.

2.      Venue is proper pursuant to 28 U.S.C. §1391 (b),(c) because the acts complained of primarily occurred within the geographical boundaries of the United States District Court for the Western District of Texas, San Antonio Division.

STATEMENT OF THE CASE

3.      Dr. Savu, a female surgeon, graduated from Medical School in Richmond, VA, did her residency at New York Med, became an NIH fellow at Cornell in Manhattan, followed by a two year fellowship in Robotic Surgery in Strasbourg, France.[Evid. File p.373]

4.      In 2003 she joined the U.S. Department of Veterans Affairs [Hereinafter "VA" or "Agency"] [Evid. File p.374] in San Diego, CA. and in 2008 relocated to the South Texas Veterans Health Care System [Hereinafter "South Texas VA"] in San Antonio, Texas. [Evid. File p.374] where she remained until her removal effective February 7, 2017. [Evid. File p.852-854].

5.      In 2014 Dr. Savu was appointed Section Chief of General Surgery. [Hereinafter "Section Chief"] over another surgeon Elihu Ledesma, M.D. [Hereinafter "Dr. Ledesma"] [Evid. File p.380]

6.      In December 2015 Dr. Savu as Section Chief was asked by Chief of Surgery William B. Perry, M.D., [Hereinafter "Dr. Perry"] to pressure a senior surgeon to retire due to

his age.  [Evid. File pp.374-376]  Based on EEO advice, Dr. Savu declined to comply. [Evid. File pp.376-377]

7.      In February 2016, Dr. Savu, as Section Chief counseled Dr. Ledesma, a surgical oncologist regarding his refusal to participate in the compulsory "Tumor Board" meetings. [Evid. File p.381]  When Dr. Ledesma still refused Dr. Savu sought the support of Dr. Perry. He told her to let it lie. [Evid. File pp.381-382]  Dr. Savu did not. [Evid. File p.382] and in February 2016 sought the support the Chief of Staff Julianna Flynn, M.D., [hereinafter "Dr. Flynn"] [Evid. File p.381];[Evid. File p.265].  In February 2016 Dr. Flynn called a meeting during which Dr. Perry initially defended Dr. Ledesma before conceding Dr. Savu was correct. [Evid. File p.382]

8.      In April 2016, Dr. Ledesma, publicly made offensive sexist remarks directed to a pregnant surgical resident and Dr. Savu. [Evid. File p.382] [Evid. File p.116]  Dr. Flynn and Dr. Perry were made aware of these comments. [Evid. File p.266] Next, Dr. Ledesma threatened to fire a female Nurse Practitioner. [Evid. File p.383]  Dr. Savu counseled Dr. Ledesma again. [Evid. File pp.116-117]  During this counseling Dr. Ledesma became confrontational and stated that he would report Dr. Savu to the highest authorities. [Evid. File p.383].  Dr. Savu contacted a VA attorney to discuss the issues.  This resulted in another meeting between Dr. Savu, Dr. Perry and Dr. Flynn in late April 2016 where Dr. Perry reluctantly supported Dr. Savu's position.[Evid. File pp. 117-118]

9.      On May 20, 2016, Dr. Savu was asked to attend an Administrative Investigation Board hearing [Hereinafter "AIB"] that afternoon. [Evid. File p.118] She was not informed of its purpose.  During the AIB she was asked general questions about her work, her interactions

4

with fellow surgeons, physicians, and residents.  Dr. Savu became aware that the conversation was transcribed and requested a copy. Despite several follow up requests this transcript was never produced.

10.    On June 14, 2016, and without any forewarning, Dr. Savu was notified by Robert Walton, the Director of South Texas VA [Hereinafter the "Mr. Walton"] that her clinical privileges were being summarily suspended. [Evid. File pp.814-815] Mr. Walton referenced her clinical decision making of three (3) of her patients. [Evid. File p.814]. that as per the Veterans Health Administration [Hereinafter "VHA"] Handbook 1100.19, a comprehensive review of the reasons for the summarily suspension of clinical privileges would be accomplished within 30 days. [Evid. File pp.708-717] and within 5 days after the review, a decision would be made to either exonerate, initiate a reduction regarding the suspension, or start a revocation process. [Evid. File p.715]

11.    Based on VHA Handbook 1100.19 Dr. Savu should have received the decision regarding her clinical privileges on or about July 20, 2016.  She did not and reminded Mr. Walton of these requirements.  Despite this Mr. Walton still refused to follow procedures.[Evid. File pp.818-819]

12.    On September 14, 2016 three months after being suspended Dr. Savu was notified that the Clinical Executive Board [Hereinafter "CEB"] of the South Texas VA was to convene on October 03, 2016.  Dr. Savu was invited to attend and was allotted 20 minutes to address the CEB.  She was informed that the CEB's recommendation would be forwarded to Mr. Walton for consideration and that Mr. Walton would, within five (5) days of the receipt

of the recommendations, make a decision to restore, to proceed with a reduction or proceed to revocation.

13.     Prior to the CEB meeting, Dr. Savu was provided with a review of a select number of her cases by two unidentified reviewers.  One from the South Texas VA [Hereinafter the "South Texas Reviewer"] the other from the Central Texas VA [hereinafter "Central Texas Reviewer"].[Evid. File pp.539-550] Examination of these reviews revealed that the findings of the South Texas Reviewer were decidedly different from those of the Central Texas Reviewer [Evid. File pp.539-550].

14.     On October 3, 2016 Dr. Savu appeared before the CEB. [Evid. File 533] She explained her rationale for managing and treating the patients, presented medical literature supporting her decisions showing she had acted within the standard of care.  And addressed the discrepancy between the findings of the South Texas Reviewer and the Central Texas Reviewer.

15.     On December 2, 2016 Dr. Savu was informed by the Texas Medical Board that their investigation into her treatment of one of the patients used to support the Agency's decision to suspend her clinical privileges had been dismissed for lack of sufficient evidence and that the standard of care was met. [Evid. File p.826]

16.     On December 15, 2016, Dr. Savu was informed by Dr. Flynn of the CEB's proposal to her remove her federal service.  [Evid. File pp.844-851]  In addition she received a notice that it was the VA's policy to report Dr. Savu to the State Licensing Board(s) [Evid. File p.525]; [Evid. File p.850];[Evid. File pp.519-526] Dr. Savu requested a review of proposed termination. [Evid. File pp.514-517]

17.     On January 27, 2017 Dr. Savu was notified by the VA Director that she would be removed from federal employment effective February 7, 2017 for: Substandard Patient Care, Failure to Appropriately Plan Care and Failure to Appropriately Follow-Up on Care. [Evid. File pp.505-507]  The letter informed Dr. Savu of her right to appeal this decision to the Disciplinary Appeals Board [Hereinafter DAB] and to request a formal hearing.[Evid. File pp.505-507].

18.     On February 7, 2017 Dr. Savu appealed her removal to the DAB and requested a formal hearing. [Evid. File pp.841-843]  Dr. Savu was informed that the hearing was scheduled for April 4, 2017. [Evid. File pp.836-838]  During her preparation for the hearing Dr. Savu discovered the identity of the Central Texas Reviewer, Dr. Matthew R. Bower, M.D. from Temple Texas [Hereinafter Dr. Bower"] as well as the identity of the South Texas Reviewer Dr. Michael Nicholl, M.D. [Hereinafter "Dr. Nicholl"].  Dr. Nicholl had been a colleague and subordinate of Dr. Savu at the South Texas VA.

19.     The DAB convened on April 4, 2017 in San Antonio, Texas with Chairperson Ali Mchaourab, M.D., from Cleveland OH; Secretary was Joseph R. Pisegna, M.D. from Los Angeles CA; and Member Patricia Stepp, M.D. from Cheyenne, WY.  All of them physicians. [Evid. File p.0043]  In his opening remarks the Chairperson stated that the Board would make written decisions on the evidence of the records. [Evid. File p.0043] Each side called witnesses who were subjected to cross examination.  Despite indicating that the South Texas VA would call both reviewers to testify, they only called Dr. Nicholl.  Dr. Savu testified on her own behalf.  The DAB hearing was concluded on April 5, 2017. [Evid. File pp.0461-0462]

20.     Based on the evidence of the records the DAB's unanimously agreed that the evidence for negligent was not present and provided an in-depth analysis as to how that had come to this determination. [Evid. File pp.0026-0038]  They agreed that all charges should be reversed, and that Dr. Savu's clinical privileges and employment should be reinstated. [Evid. File p.0039]

21.     On July 20, 2017, the Acting Principal Deputy Under Secretary of Health drafted a memorandum asking the DAB to revisit its findings and thoroughly conduct another analysis for all the evidence and witness testimonies on the record in order to provide justification of the DAB's decision. [Evid. File pp.836-838]

22.     In response the DAB analyzed the evidence and the testimony once more and on November 29, 2017, made its second unanimous recommendation.  Again, they found no evidence for negligence and that there was no proof to support Dr. Savu's removal.  They recommend a one day suspension, reversal of the penalty of removal and re-institution of the clinical privileges. [Evid. File p.0024]

23.     That same day, and despite the DAB's in depth analysis and well-reasoned unanimous decision, the Acting Principle Under Secretary for Health issued a reversal of the unanimous decision by the DAB because he personally felt that the decision by the DAB was "clearly" contrary to the evidence under 38 U.S.C. §7462; VA Handbook 5021, Part V, Chapter 1, paragraph 9(e)(1)(a). [Evid. File p.002]

ISSUES PRESENTED

Petitioner Michelle K. Savu, MD alleges that the VA did not provide a reasoned explanation and therefore acted in an arbitrary and capricious manner when it, contrary to all

the evidence, reversed the DAB's unanimous decision to re-instate her clinical privileges with the South Texas Veterans Health Care System in San Antonio Texas under 38 U.S.C. §7462(f).

**ARGUMENT**

24.     A person suffering a legal wrong because of an agency's action, or who is adversely affected or aggrieved by an agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S. C §702.

25.     The removal of Dr. Savu from Federal Service is reviewable under the Administrative Procedure Act. [Hereinafter "APA"] which embodies a "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U. S. 136, 140 (1967).  The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U. S. 788, 796 (1992). It requires agencies to engage in "reasoned decision-making," *Michigan v. EPA*, 576 U. S. 743, 750 (2015) and directs that Agency's action be set aside if they are arbitrary and capricious. 5 U.S. C §706(2)(A).

26.     The APA instructs reviewing courts to set aside agency actions that are arbitrary, capricious and an abuse of discretion, or otherwise in accordance of law. 5 U.S.C §706(2)(A); *Department of Commerce et al v. New York et al,* 588 U.S. ___ 139 S. Ct. 2551, 204 L. Ed 2d 978 (2019).

27.     Although the Agency, under 38 U.S.C. §7462; VA Handbook 5021, Part V, Chapter 1, paragraph 9(e)(1)(a) is authorized through its representative to reverse a decision by the DAB, it may only do so if the decision of the DAB is "clearly" contrary to the evidence. The DAB's in-depth analysis, performed on two separate occasions, shows that the decision

to reinstate Dr. Savu was not "clearly" contrary to the evidence but was well-reasoned and therefore the Agency's reversal of the DAB's decision based on one (1) person's unsupported rationale was arbitrary and capricious.

28.     "Generally, an agency decision is arbitrary and capricious if 'the agency relies on factors which Congress either had not intended for it to consider, or entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quoting Bedford Cty. Mem'l *Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985)); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Dr. Savu will argue that the Agency's explanation for its decision clearly runs counter to the evidence presented to the DAB.

29.     In order to permit meaningful judicial review, an Agency must " 'disclose the basis' " of its action.  *Burlington Truck Lines, Inc. v. United States*, 371 U. S. 156, 167–169  see also *SEC v. Chenery Corp.*, 318 U. S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.")

30.     In reviewing an agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.  *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U. S. 519, 549 (1978); *Camp v. Pitts*, 411 U. S. 138, 142–143 (1973) (per curiam).  Considering only contemporaneous

explanations for agency action instills confidence that the reasons given are not simply "convenient litigating position[s]." *Department of Homeland Security v regents of University of California*, 591 U.S. ___ (2020) citing *Christopher v. SmithKline Beecham Corp.*, 567 U. S. 142, 155 (2012)

31.     The scope of review is "narrow" and the only determination that must be made whether the Agency examined "the relevant data" and articulated "a satisfactory explanation" for its decision.  This must include "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (internal quotation marks omitted) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))  The goal is to ensure that the Agency remained "within the bounds of reasoned decision making," *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U. S. 87, 105 (1983).  Dr. Savu will argue that the rational connection between the facts in the record found and the Agency's decision to reverse is lacking.

32.     The Agency's decision and rationale for overturning the DAB's unanimous recommendation to reinstate Dr. Savu runs counter to the evidence contained in the record and analyzed by the DAB.  The DAB in a well thought out and reasoned explanation explained why the Agency failed to prove their allegations (specifications) by a preponderance of the evidence.

33.     The record before the Court shows that after a two day hearing the Agency failed to present evidence that supported the decision to remove Dr. Savu from Federal Service.  The DAB therefore issued a unanimous decision to reinstate Dr. Savu.  [Evid. File p.0039]   In their analysis, the DAB addressed and explained the rationale regarding its

recommendation and decision.  [Evid. File pp.0026-0038]  It found the evidence the Agency presented was weak or unfounded. [Evid. File p.0035]  The eight cases the Agency selected to substantiate their case to remove Dr. Savu's privileges did not reveal any pattern of negligence or incompetence or failure to perform her duties to the standard of care.  [Evid. File p.0035] They concluded that the review of Dr. Nicholl ( a colleague and one time subordinate of Dr. Savu) was contradicted by the review of Dr. Bower.  That the Agency had not provided Dr. Bower key information.  [Evid. File p.0035] That Dr. Savu engaged in high risk surgeries, that her morbidity and mortality ratings were better than most of her peers. That the way she was perceived at the VA indicates a sudden shift. That she went from being highly regarded to being investigated for negligence, but that the Agency failed to produce any evidence of this negligence. [Evid. File p.0037]

34.    The DAB commented on the fact that two of the witnesses were anesthesiologists whose testimony did nothing to provide substantial evidence.[Evid. File p.0037]  They called Dr. Perry's credibility in question after Dr. Flynn testified that the VA had removed him as Chief of Surgery during this process. [Evid. File p.0037].  The DAB concluded that based on the number of cases presented and the high complexity of cases there was no pattern of negligence, incompetence or poor decision making. Ultimately, the DAB did not sustain any of the charges. [Evid. File p.0037] and unanimously concluded that the evidence against Dr. Savu was weak and unfounded and that the selected cases did not show any pattern of negligence, of incompetence or failure to perform duties of the standard of care. [Evid. File p.0035] Therefore, DAB unanimously agreed that all charges should be reversed and that Dr. Savu should be reinstated. [Evid. File p.0039]

35.     This decision was sent to the Acting Principal Deputy Under Secretary for Health.  Instead of accepting the conclusions by the DAB, he sent a memorandum back asking the DAB to revisit its findings, and to conduct a thorough analysis of all the evidence and witness testimonies on the record in order to provide justification.  [Evid. File p.0025]  The DAB did so once again and provided the Agency again with a second well thought out rationale [Evid. File pp. 0026-0038] which again called for the reinstatement of Dr. Savu albeit with one difference being that she had to serve a one (1) day suspension.

36.     In support of its "second" unanimous recommendation, the DAB first addressed Charge I: "Substandard Patient Care."  In Case No 4 the Agency alleged that Dr. Savu was inadequately experienced in robotic surgery. [Evid. File pp.0011]. The Agency did not provide the medical record and Dr. Nicholls confirmed Dr. Savu's two year fellowship in robotic surgery [Evid. File pp.162-163]; and that she was instrumental in setting up the robotics program in the San Antonio VA [Evid. File p.163].  Physician Assistant Nikeeta Wilson who assists all general surgeons testified that Dr. Savu skills are similar to that of other robotic surgery practitioners. [Evid. File pp.315] and that her skills in laparoscopic surgery were superior compared to other surgeons [Evid. File p.315]. Testimony showed that the main indication for surgery of this patient was improvement of quality of life; that pre-operatively internal medicine, cardiology, and anesthesia were involved; and that the patient and his daughter were advised of the risks and made the decision to go ahead. The DAB unanimously found that the Agency failed to prove this specification by a preponderance of the evidence. [Evid. File pp.0026- 0039]

37.     In Case No. 5 the allegation was that Dr. Savu had erred in her judgement; misinterpreted a CT-scan; and intra-operatively placed a suprapubic catheter without urology guidance. [Evid. File p.0012]. Again, the Agency provided no medical records in support. Testimony showed that the ER physician and the senior resident interpreted the CT the same as Dr. Savu; that the official radiology reading did not get transcribed until after the surgery; that it is the standard of care that any non-urology surgeon is allowed to place a suprapubic catheter when the bladder is exposed; that under the circumstances the best course of action was to perform potentially life-saving exploratory surgery and prevent the development of an acute abdomen (which is life threatening) rather than to wait for the CT-scan to be transcribed by a radiologist.   The DAB found unanimously that the agency failed to prove this specification by a preponderance of the evidence. [Evid. File p.0012]

38.     In Case No. 8 the Agency alleged that Dr. Savu's choice of surgery was incorrect and that she lacked in her follow-up. The Agency did not provide any medical records; the reviewers disagreed with each other and Dr. Bower did not find Dr. Savu's choice of surgery wrong.  The DAB unanimously found that the Agency failed to prove this specification by a preponderance of the evidence. [Evid. File p.013].

39.     In Case No 9 the Agency alleged that Dr. Savu performed a previously undescribed surgical technique.  [Evid. File p.0014].  The Agency did not provide the medical records to the DAB and the reviewers, not familiar with this well described technique, could not even agree on the type surgery. Dr. Nicholl really missed the boat when he called it "experimental" Dr. Bower was closer in his description by calling it an "Incomplete Nissan." The DAB heard that this case was presented in a pre-surgery conference where none of the

attending surgeons had objected to Dr. Savu's proposed surgery.  The DAB found a vast disagreement between the two reviewers. [Evid. File p.14] Dr. Perry, Dr. Nicholl, and Dr. Savu all testified that the outcome for this patient was excellent. [Evid. File p.109 and p.175].  The DAB unanimously found that the Agency failed to prove this specification by a preponderance of the evidence. [Evid. File p.0014]

40.     In Case No. 13 the Agency alleged that the surgery of a recurring ventral hernia on a morbidly obese patient was done poorly and lead to malnutrition [Evid. File p.15].  Once again, no medical records provided. The reviewers disagreed. Dr. Bower concluded that most surgeons would have performed the surgery the same way and that recurrence of ventral hernias is common in obese patients.  Of interest is the fact that Dr. Nicholls redid the surgery himself.  While Dr. Savu's mesh failed after nine (9) months, his surgery (admittedly) failed after six (6) month. [Evid. File p.168] The DAB found unanimously that the Agency failed to prove this specification by a preponderance of the evidence. [Evid. File p.0015].

41.     In Case No. 28 the Agency alleged that by not inserting a nasogastric tube intraoperatively the patient developed an ileus and pulmonary aspiration. [Evid. File p.0015].  No medical records were provided.  The two reviewers disagreed completely.  Dr. Bower did not see any violation of the standard of care and stated that the incidence of ileus is not affected by the insertion of a nasogastric tube.  The DAB found unanimously that the Agency for the second time failed to prove this specification by a preponderance of the evidence. [Evid. File pp.0015-0016].

42.     In Case No. 36 the Agency alleged that there was poor preparation prior to colonoscopy and improper follow up. [Evid. File p.15].  No medical records were provided.

Even Dr. Nicholl gave this case a rating of II, meaning there was little wrong. Dr. Bower did not find any errors.  Therefore, neither reviewer found a violation of the standard of care.  Not surprising the DAB found unanimously that the Agency failed to prove this specification by a preponderance of the evidence.

43.     In Case No 41 the Agency alleged that Dr. Savu missed a polyp that needed to be removed. [Evid. File pp.16-17] The Agency did not place any medical records in evidence. Dr. Perry, Dr. Nicholl, Dr. Bower as well as Dr. Savu in her testimony, agreed this was a very difficult case.  It was Dr. Perry who had referred the patient to Dr. Savu because. [Evid. File p.0087 ]. After the surgery it was discovered that the polyp was not present in the tissue that was removed.  Dr. Savu admitted on the records to making this error.  The DAB specifically stated in their report that she was regretful, took full responsibility and did not make any excuses. Fortunately, for the patient the polyp was found to be benign. In their first report to the Agency the DAB had stated that this was not negligence and unanimously found that the Agency failed to this specification by a preponderance of the evidence.  After the second evaluation the DAB felt that Dr. Savu self-admitted mistake warranted a one (1) day suspension.

44.     The DAB did not sustain Charge II in whole or in part in all cases.  Five of the eight cases were implicated in the allegation was that there was a Failure to Appropriate Plan Care. The DAB's reasoning was similar as to their reasoning for Charge I. [Evid. File pp.0021]

45.     Charge III alleged Failure to Appropriately Follow-up on Care.  Only two (2) of the eight (8) cases were implicated.  The DAB did not sustain Charge III in whole or in part and put forth a similar reasoning as they had for Charge I. [Evid. File pp.0021-0022]

46.     The end result of this second analysis was that the DAB (again) unanimously decided to reinstate Dr. Savu, albeit with one (1) day suspension for her failure to locate a polyp during surgery.   In determining the penalty of a one (1) day suspension the DAB commented on the fact that Dr. Savu has an "Outstanding" rating by the VA; in 2014 she was rated a "superb surgeon" and that her leadership role for the prior period was "Excellent;" that her file did not suggest that there had been any patient issues in the past; her rate of complications was within the accepted margins; that considering the high risk surgeries she performed she has a good record in terms of morbidity and mortality compared to the national benchmarks [Evid. File p.0022] Having stated all this the DAB found that the failure to remove a polyp in case no 41 did warrant a corrective action and recommended a one (1) day suspension which the DAB found to be within the realms of reasonableness.

47.     The Agency apparently dissatisfied with the DAB's second finding and conclusions and in an unusual move decided to uphold the penalty of removal from Federal Service. Under 38 U.S.C. 7462; VA Handbook 5021, Part V, Chapter 1, paragraph 9(e)(1)(a). The Agency indiscriminately upheld all the allegations (specifications) except for case no. 36 where both reviewers agreed there was no violation of the standard of care.

48.     This arbitrary and capricious interference from the Agency with the unanimous findings by three physicians after two days of testimony hearing is abundantly clear from the record.   The Agency claims that the reviewers rated the level 3 in half of the specifications. This is false.   The reviewers hardly agreed on any of the cases.   In addition, the Agency used material from the CEB hearing where Dr. Savu was allowed only twenty (20) minutes to explain herself and although she was allowed to bring representation, her representative could

not speak.  The CEB was allowed to question Dr. Savu, but Dr. Savu could not pose any questions herself.  None of the witnesses called by the Agency at the CEB hearing were subjected to cross-examination by either Dr. Savu or her representative. The Agency's use of evidence from the CEB, which Dr. Savu had no access to, is highly inappropriate.

49.     A most alarming declaration the Agency made in support of its decision is the assertion that Dr. Savu did not present compelling evidence to support the interpretation more favorable to her. This statement is disturbing because the goal is to ensure that the Agency remains "within the bounds of reasoned decision making," *Baltimore Gas & Elec. Co. v.* 462 U.S. at 105 (1983). Instead, the Agency in defense of their decision shifted the burden of proof onto Dr. Savu. It is not Dr. Savu who bears the burden. It is the Agency. Therefore, the Agency's rationale in upholding Dr. Savu's removal has been incorrectly based on the assumption that it was Dr. Savu's responsibility to provide compelling evidence. This assumption runs counter to *Baltimore Gas & Elec. Co.*

50.     In overturning the unanimous decision by the DAB, the Agency did not and was not able to provide a satisfactory explanation for its action and to give a rational connection between the facts found and the decisions it made.  The Agency did not provide any of the medical records to the DAB.  The agency only produced four [4] witnesses.  Dr. William B. Perry, the former Chief of surgery, Dr. Michael Nicholl, a colleague surgeon with the South Texas VA and at one time subordinate of Dr. Savu, Dr. Gary B. Elliot, an anesthesiologist, and Dr. James N. Rogers another anesthesiologist.  None of them brought with them the medical records to support the Agencies assertions either.  The fact that the Agency never presented the medical records to the DAB represents a real problem because it

prevented the DAB to verify the accuracy of witness' testimony and conclusions. Administrative agencies are not restricted to the strict rules of evidence. Hearsay for example, which has rational probative force may constitute substantial evidence. *Gilbert v. Johnson,* 419 F.Supp. 859, 880 (N.D.Ga.1976), *aff'd in part, rev'd in part on other grounds,* 601 F.2d 761 (11th Cir.1979); On the other hand for administrative findings "to be valid, they cannot be based upon hearsay alone, nor upon hearsay corroborated by a mere scintilla." *Gilbert,* 419 F.Supp. at 880 (citing *Willapoint Oysters, Inc. v. Ewing,* 174 F.2d 676, 690 (9th Cir.1949)). And "Mere uncorroborated hearsay or rumor does not constitute substantial evidence." *Consol. Edison,* 305 U.S. at 230. Here Dr. Nicholl and Dr. Perry testified to issues that could only be found and corroborated by the Medical Record but failed to produce this record to substantiate their assertions. Their testimony was therefore uncorroborated by the record.

51.     Most remarkable was the fact that the Agency did not produce Dr. Bower, the reviewer from Central Texas. But Dr. Bower was a problem of the Agency. His review was markedly different that the review of Dr. Nicholl. The Agency did not call the Director, Robert Walton, and Dr. Julianna Flynn the Chief of Staff two key players in the removal of Dr. Savu either. Robert Walton was on the witness list but was not called by the Agency and the DAB "sua sponte" requested him as a witness. Dr. Flynn was put on the witness list by Dr. Savu as an adverse witness. The questioning of Mr. Walton and Dr. Flynn concentrated on the fact as to why the Agency did not adhere to its own policies and procedures even after the Agency was reminded by Dr. Savu. [Evid. File pp.818-819]

52.     To counter the Agency's allegations Dr. Savu presented Nikeeta Wilson a Physician Assistant who worked with multiple general surgeons in the South Texas VA [Evid.

File pp.836-838] in order to support Dr. Savu's defense that she is as competent as other surgeons in the operating room and often more proficient as during laparoscopic surgeries. [Evid. File pp.315-317].

53.     Dr. Savu called Dr. Tisha Lunsford, [Hereinafter "Dr. Lunsford"] an associate professor of medicine at the University of Texas Health San Antonio and staff clinician at the VA and the gastroenterology fellowship program director.  Dr. Lunsford told the panel it was Dr. Perry who recommended Dr. Savu to teach as an expert educator. [Evid. File p.359]. That Dr. Savu had an excellent teaching style and that the faculty found her to be essential to the teaching process.

54.     In overturning the decision by the DAB, the Agency offered explanations that runs counter to the evidence on the record. Its decision is therefore arbitrary and capricious. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d at 293 (4th Cir. 2018) Without exception the Agency's representative; discounted each and every reason given by the DAB as to why the Agency failed to prove its case by a preponderance of the evidence.  Ignored every reason the DAB gave as to why Dr. Savu should be reinstated. The representative discounted the fact that Dr. Bower had a significantly different opinion than Dr. Nicholl and used CEB testimony [Evid. File p.0005] instead of the DAB record in support of his findings.

55.     The Agency's use of CEB testimony is highly disturbing.  First of all, it shows that the Agency had access to the CEB transcript while the DAB and Dr. Savu did not.  In fact, Dr. Savu was not allowed to be present when the CEB listened to witnesses, and even if she had, she would not have been allowed to cross-examine and question any of the witnesses. The fundamental requirement of due process is the opportunity to be heard at a meaningful

20

time and in a meaningful manner." *Mathews v. Eldrigde*, 424 U.S. 319, 333 (1976).  The CEB did not provide Dr. Savu that time and manner.  The DAB did.

56.     The fact that Dr. Nicholl was a colleague and a onetime subordinate was discounted, thereby also discounting the commonly accepted practice that is it best to have two outside reviewers who bear no relationship to the person being reviewed to conduct the review. [Evid. File p.0023]  Instead the Agency's representative concluded that the DAB found mitigating factors applicable to the sustained charge. [Evid. File p.0008].  The Agency's failure to prove the allegations by a preponderance of the evidence is not a mitigating factor.  It is a failure of the Agency to meet the burden of proof. When in a criminal, civil or administrative proceeding one fails to meet their burden, one will not get the relief one is looking for. There is absolutely no evidence that the DAB abused its discretion in determining the outcome of the matter before them.

57.     Just as the Jury is the finder of fact during a trial, so is the DAB when it sits to determine if the action by the Agency is supported by the evidence.  During the hearing, the DAB is in the best position to interpret the evidence and observe the witnesses.  It is the DAB who is able to comment on the fact that the Agency did not put any medical records in evidence which could have helped substantiate their allegations.  It is the DAB who is able to see and hear the witness' in person, observe their behavior and ascertain their trustworthiness and reliability.  In addition, the DAB is in a position to ask the witnesses questions.  That the DAB took it job seriously is evidenced by the fact that it ordered Mr. Walton, who was not on the Agency's witness list, to come as testify.  The DAB was in the best position to determine that the Agency did not prove its allegations by a preponderance of the evidence.

58.     "Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion." *Olenhouse v. Commodity Credit Corp.,* 42 F .3d 1560, 1574 (10th Cir.1994)). In its decision to overturn the unanimous decision by the DAB, the Agency merely recited the opinions of Dr. Nicholl without taking any of the other evidence and testimony into consideration including that of Dr. Savu who presented herself in a professional manner with a clear and concise explanation of all clinical decisions she had made as pertaining to the cases put forth by the Agency to evidence her alleged below the standard of care treatment. In doing so the Agency acted in an arbitrary and capricious manner and did not present any substantiation that the unanimous decision by the DAB flew counter to the evidence in front of them.

59.     Based on the arbitrary and capricious action by the Agency, Dr. Savu is entitled to a correction of the personnel action namely the reinstatement of her clinical privileges which caused her removal from the Agency.

**BACK PAY ACT**

60.     The Back Pay Act of 1966, 5 U.S.C. § 5596 (1988). provides that a federal government employee is entitled to back pay if "found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee." *id.* § 5596(b)(1). The Supreme Court reads the Back Pay Act as a statute that mandates compensation by the federal government in a successful suit against the government. *Bowen v. Massachusetts,* 487 U.S. 879, 891–92,(1988)   "The Back Pay Act is the means by which

appointed employees subjected to unjustified personnel action are given a cause of action against the United States." *United States v. Hopkins,* 427 U.S. 123, 128 (1976).

61.     Due to the fact that the reversal of the unanimous decision of the DAB was arbitrary and capricious Dr. Savu is entitled, on correction of personnel action to receive for the period for which the personnel action was in effect—

i.    an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period; and

ii    reasonable attorney fees

iii   interest computed for the period compounded daily.

## CONCLUSION

62.     In the months leading up to Dr. Savu's removal the Agency ignored the procedures laid out in the VHA Handbook 1100.19.

63.     The record of Dr. Savu's appeal to the DAB shows that the DAB on two occasions in a succinct, concise, and a thoughtful manner laid out its rationale why the Agency failed to prove its Charges against Dr. Savu by a preponderance of the evidence and that the selected cases did not show any pattern of negligence.

64.     After the DAB delivered its original unanimous decision, the Agency directed them to reexamine the rational for their findings. The DAB did. They dug deeper in the records and expanded their reasoning and demonstrated that the evidence the Agency had used to remove Dr Savu from Federal Service did not rise to the necessary level of proof.  The DAB did not see any evidence that Dr. Savu's clinical decision making showed a pattern of

negligence for which her clinical privileges needed to be suspended and for which removal from Federal Service was justified.

65.     In stark contrast, the Agency did not seem to care about the insufficiency of the evidence contained in the record.  In their zealous effort to remove Dr. Savu they misstated the facts; almost exclusively adopted Dr. Nicholl's conclusions; discounted the commonly accepted practice that is it best to use two outside reviewers bearing no relationship to the person being reviewed; see the failure to proof their case by a preponderance of the evidence as just an insignificant mitigating factor; shifted the burden of proof to Dr. Savu alleging she did not present compelling evidence to support an interpretation more favorable to her; and used testimony from the CEB hearing, not available to either the DAB or Dr. Savu in support of their decision.

66.     The fact alone that the Agency in support of its decision to invalidate the DAB decision shifted the burden of proof and used CEB evidence not contained in the record renders its decision arbitrary and capricious and in violation of the APA.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED based on the record the Agency's decision to overturn the unanimous decision of the DAB can only be considered "arbitrary" and "capricious" For this reason Dr. Michelle Savu is asking this court to vacate the decision by the Agency to overturn the unanimous decision of the DAB to reinstate her clinical privileges and award her all the compensation to under the Back Pay Act of 1966, 5 U.S.C. § 5596 (1988).

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served on Counsel for Defendant

Elizabeth F. Karpati
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, Texas 77002
713-567-9767

*Attorney for the United States of America*

by electronically filing the record with the Clerk of the Court using the CM/ECF system.


/s/ Adriaan Jansse
**ADRIAAN JANSSE**