UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**MICHELLE K. SAVU, MD,**

    *Plaintiff*,

v.                                              Case No. SA-18-CV-00993-JKP-ESC

**UNITED STATES OF AMERICA,**
et al.,

    *Defendants*.

## MEMORANDUM OPINION AND ORDER

Michelle K. Savu seeks judicial review of an agency decision. *See Pet. Judicial Review* (ECF No. 1); *Pet'r's Opening Brief* (ECF No. 33). The Department of Veterans Affairs (VA) Acting Principal Deputy Under Secretary for Health (the AP) reversed the VA's Disciplinary Appeals Board's (DAB or the Board) unanimous decision to reinstate Dr. Savu's clinical privileges. Dr. Savu claims the AP acted arbitrarily and capriciously when he reversed the DAB's decision. She further contends his decision is not supported by substantial evidence. *ECF No. 33 at 8-9*. The Court has jurisdiction to review the AP's decision pursuant to 38 U.S.C. § 7462(f). For the reasons discussed below, the Court vacates the AP's reversal of the Board's decision.

### I. BACKGROUND

Dr. Savu has fellowship training in robotic surgery. R. 372-73, 534.[1] She joined the VA in 2003, transferring to the San Antonio South Texas Veterans Health Care System in 2008. R. 374. Dr. Savu twice served as Section Chief of General Surgery during her tenure. R. 36, 377, 379-80,

---

[1] "R. 1" refers to a page in the Administrative Record, filed under seal. For ease of reading, the Court does not use "*id.*" when citing to the record but employs the R. designation throughout. All quotations are reproduced as they appear in the record. The Court has not quoted any material from the Administrative Record that would require filing this Memorandum Opinion and Order under seal.

841. Upon her summary suspension, the VA, through clinical peers, conducted a "comprehensive review" of her surgical practice consisting of a sample of her laparoscopic, colonoscopy, and general surgery cases. R. 669, 681. Of the eighty to one hundred cases reviewed, some were selected based on concerns brought by residents or others; some were personally selected by Dr. William B. Perry, the former Chief of Surgery; others had been identified at the morbidity and mortality conference; and some were selected randomly. R. 124-25. Upon completion of the comprehensive review, the Clinical Executive Board[2] (CEB) met to review the findings and make recommendations. R. 529-37.

Finding "substandard care and professional incompetence," the CEB recommended revocation of Dr. Savu's privileges. R. 537. Given this recommendation, the Chief of Staff decided to remove Dr. Savu from federal service. R. 519-25. Upon receiving notice of the proposed removal, Dr. Savu timely responded, detailing the reasons she should not be removed. R. 514-17. The VA removed Dr. Savu from employment effective February 7, 2017. R. 505-07. Dr. Savu appealed.

After a two-day hearing, the Board unanimously decided to reverse the decision to remove Dr. Savu from service. R. 26-39. The AP vacated that decision because it appeared to him to be contrary to the evidence and he remanded the matter to the Board for further consideration. R. 25; *see* 38 U.S.C. § 7462(d)(2)(B). After reconsideration, the Board issued another unanimous decision reversing Dr. Savu's removal from service, re-instituting her clinical privileges, and imposing a one-day suspension. R. 9-24. The AP reversed the Board's decision as "clearly contrary to the evidence" and upheld Dr. Savu's removal from federal service. R. 2-8; *see* 38 U.S.C. § 7462(d)(2)(A).

---

[2] The Clinical Executive Board is the "clinical service chief leadership" that approves privileges and clinical policies for the South Texas Veterans Health Care System. R. 292.

Dr. Savu filed her *Petition for Judicial Review* on September 24, 2018. *ECF No. 1*. With the filing of Dr. Savu's reply brief, the matter raised in her petition is ready for this Court's review. *ECF Nos. 33, 34, 35*.

## II. LEGAL STANDARD

When a VA employee seeks judicial review after being removed from service for conduct that involves professional conduct or competence, the reviewing court

> shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule, or regulation having been followed; or (C) unsupported by substantial evidence.

38 U.S.C. § 7462(f).

An agency's decision is arbitrary and capricious if it does not "articulate any rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). A rational connection is articulated by making findings that support the decision and supporting those findings with "substantial evidence." *Id.* (citations omitted). "Substantial evidence means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

A decision "that fails to account for relevant factors"; "evinces a clear error of judgment"; entirely failed "to consider an important aspect of the problem"; offered "an explanation that runs counter to the evidence"; "or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," must be set aside. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't Health & Human Servs.*, 985 F.3d 472, 475 (5th Cir. 2021). But if the agency has provided a "minimal level of analysis" from which the reason for its decision "may be discerned,"

the decision should be upheld. *Brackeen v. Haaland*, ___ F.3d ___, ___, No. 18-11479, 2021 U.S. App. LEXIS 9957, at *213-14, 2021 WL 1263721, at *69 (5th Cir. Apr. 6, 2021) (en banc) (per curiam).

### III. DISCUSSION

If an AP finds a decision of a DAB "to be clearly contrary to the evidence or unlawful, [he or she] may—(A) reverse the decision of the board, or (B) vacate the decision of the board and remand the matter to the Board for further consideration." 38 U.S.C. § 7462(d)(2). Neither the statute nor the VA Handbook[3] defines "clearly contrary to the evidence," no party points to or supplies a definition, and the Court in its research unearthed no caselaw definition framed in the appropriate context.

Given their plain and ordinary meanings, "clearly" means "without doubt; obviously."[4] And "contrary to the evidence" means "conflicting with the weight of the evidence presented at a contested hearing." Black's Law Dictionary 415 (11th ed. 2019). Applying these definitions, if an AP finds a Board's decision conflicts with the weight of the evidence presented at the DAB hearing, the AP may reverse the decision of the Board. The term "clearly" indicates that the conflict between the Board's decision and the weight of the evidence presented at the hearing would be obvious to an ordinary person. A decision to reverse will be upheld if it articulates how the Board's decision conflicts with the weight of the evidence presented at the hearing. *See Burlington,* 371 U.S. at 168; *Brackeen*, 2021 WL 1263721, at *69. The AP put forth six reasons for finding the DAB's decision to be clearly contrary to the evidence. The Court addresses each of these in turn.

---

[3] VA Handbook 5021, Part V, Chapter 1, paragraph 9(e)(1)(a).

[4] Clearly definition, Oxforddictionsaries.com, https://premium.oxforddictionaries.com/us/definition/american_english/clearly (last visited Apr. 16, 2021). "Obviously" means "in a way that is easily perceived or understood." *Id.*, https://premium.oxforddictionaries.com/us/definition/american_english/obviously (last visited Apr. 16, 2021).

**A. Reason One:** *The evidence shows [both clinical peer reviewers, Drs. Nicholl and Bower] rated the Level of Care as a Level 3 in half of the specifications in reference to substandard care.*[5] *. . . R. 2.*

The AP's first reason for reversal provides no analysis. He does not explain why the Board's decision conflicts with the weight of the evidence presented at the DAB hearing. An explanation of why the AP made his decision, even if rudimentary, would be sufficient to satisfy the "requirement that [he] provide an adequate explanation" but the AP provides no explanation. *Brackeen*, 2021 WL 1263721, at *68.

He appears to assert that the Board could not have reached the conclusion that Dr. Savu should be reinstated solely because both reviewers "rated the Level of Care as a Level 3 in half of the specifications in reference to substandard care." R. 2. In other words, the ratings—standing alone—dictate affirmance of the decision to remove Dr. Savu because the "reviewers' findings were based on review of the relevant medical record and clearly articulate how they determined [Dr. Savu] performed substandard patient care." R. 2. This analysis does not contain enough information to allow the Court to draw even a reasonable inference that the decision of the DAB conflicts with the evidence presented at the hearing.

The two decisions issued by the DAB show it did not rely solely on the ratings. The Board's analysis of each case noted the ratings assigned by the reviewers, discussed the findings of the reviewers, considered the testimony of witnesses, and when necessary referred to subject matter expertise provided by board members. The Board's decision indicates the peer reviewers' ratings is where the conversation began, not what the evidence concluded.

---

[5] Clinical peer reviewers rate cases "level of care" one, two, or three. R. 669, 681. A reviewer rates a case *level one* if the reviewer believes most experienced, competent practitioners *would have managed the case similarly* in all aspects of care; *level two* where most experienced, competent practitioners *might have managed the case differently* in one or more of the listed aspects of care; and *level three* where most experienced, competent practitioners *would have managed the case differently* in one or more of the listed aspects of care. R. 669, 681.

**B. Reason Two:** *The Board discounted evidence that Dr. Bower rated the Level of Care as a Level 3 in Charge 1, Specification 4, and Charge 2, Specification 4*. R. 3.

Dr. Savu's removal was based on three charges: (1) substandard patient care; (2) failure to appropriately plan care; and (3) failure to appropriately follow-up on care. "Specification 4" correlates with case number nine. R. 5.

In his assessment of case number nine, the AP states that the "Board's findings do not show consideration for the fact that the evidence showed Dr. Bower later stated this should have been rated a 3." R. 4. He further states that the "Board stated under 'Other Factors Considered' that it gave no weight to Dr. Bower's change in rating, and considered his initial rating to be final." R. 6.

The record shows the Board did not discount evidence related to any change in Dr. Bower's ratings. The Board's decision acknowledges that at the CEB meeting Dr. Bower "said that perhaps he might have under-rated his reviews." R. 23. The Board stated, however, that it "believes that a surgeon reviewing at his/her own pace a given case is more likely to give a fair rating than when he is [being asked] by the party investigating the person being reviewed." R. 23. The Board also noted that they did not have the benefit of Dr. Bower's live testimony and therefore had to rely on his written opinions. It was for those reasons the board gave "no weight" to Dr. Bower's purported change of rating and "considered the initial ratings of the cases by Dr. Bower as final." R. 23.

Importantly, the Board's decision was not based solely on the ratings assigned by the reviewers. Instead, it concluded:

> the [two] surgeons who reviewed this case didn't agree totally. One thought it is a violation of the patient's right, and experimentation. Another thought [Dr. Savu] planned a modified Nissen in a patient where Nissen procedure has been deemed contraindicated. A [third] reviewer from outside the hospital would have been ideal. The board found that Dr. Savu's testimony provided some insight into her decision to plan and tailor the surgery to the need of this patient. Her testimony seemed credible and [was] not opposed by agency counsel. The outcome of the patient was good; and the choice of surgery was based on her knowledge of a technique practiced by a renowned surgeon in Portland, Oregon, although we have been given

no document to confirm that. But the outside reviewer did not think it was substandard, and thought this was a modified Nissen. The reviewer who had a strong opinion against how this case has been done is a working colleague of [Dr. Savu] which places his credibility in question. Hence, the board was unanimous in finding that the agency failed to prove this specification by a preponderance of the evidence.

R. 20.

The Court may not vacate the AP's decision because it "thinks [his] interpretation or legal analysis is incorrect," or because it "disagrees with [his] decision." *Brackeen*, 2021 WL 1263721, at *68. But the Court will not rubber-stamp a decision that fails to communicate a reasoned explanation or fails to demonstrate the application of the relevant standard. Moreover, an incorrect representation of the evidence presented or the basis for a board's decision are grounds to vacate an AP's decision and remand the matter so that the AP may have an opportunity to revisit his analysis.

**C. Reason Three:** *The Board appears to have discounted Dr. Nicholl's testimony . . . without any clear articulated reason other than, "he is a working colleague of [Dr. Savu] which placed his credibility in question." The Board did not perform a credibility analysis for his or any other witnesses' testimony, and did not provide any indication as to how Dr. Nicholl's credibility was impaired, despite Dr. Nicholl's testimony that he remained objective throughout the review process*. **R. 3.**

In its decision, the Board generally disapproved of both reviewers because they were in the same VISN[6] as Dr. Savu. R. 11, 530. The Board found this choice of reviewers "weak," noting: "It is always best to have [two] outside competent reviewers who bear no relationship to the person being reviewed." R. 23. The Board also disapproved because only the "internal" reviewer (Dr. Nicholl) testified in person. R. 11. The Board further found Dr. Nicholl's in-person testimony was less credible than Dr. Bower's written testimony because Dr. Nicholl was a working colleague and

---

[6] Veterans Integrated Services Networks. Drs. Savu and Nicholl worked together at San Antonio Veterans Health Care Services. All three were in VISN 17. R. 530.

previous subordinate of Dr. Savu. R. 23. While the Board gave more weight to Dr. Bower's testimony, it did not disregard Dr. Nicholl's testimony. R. 10-22.

Additionally, in its first decision the Board stated:

> Dr. Nicholl came across [as] professional and credible. However, often time, his review of her cases was contradicted by the review of the outside reviewer, Dr. Bower. When the [two] of them seemed to agree on a rating of III (most providers would have done it differently) the board noted that the cases as they were presented to that outside reviewer were missing key information. One good example is charge 1, specification 2, case #5: The CT official reading came after the exploratory emergency ended. That was not shared with Dr. Bower.

R. 35. The Board also noted that Dr. Nicholl testified that he had reviewed many cases in addition to those presented to the Board and he found those cases to "have been done properly, and following the standard of care." R. 35, 164-65.

In its analysis of each case, the Board reiterates each reviewer's rationale, restates the testimony, and identifies the evidence it relied on before stating its conclusion. The Board noted throughout that it "was left to decide without medical records, and with [two] reviewers, one who is internal and one reviewer who didn't testify." R. 11-22, 27-29, 31. Nonetheless, each of the Board's findings were supported with relevant evidence. While the Board may not have ticked a list of credibility factors,[7] the text of its decisions show it assessed the credibility of the witnesses. R. 23, 35-37.

**D. Reasons Four and Five:** *When there were inconsistencies in the reviewer's assessment of the cases, [Dr. Savu] did not provide compelling evidence to support the interpretation more favorable to her. [Dr. Savu] failed to support her claim of acceptable plan of care or follow-up through any documentation independent of her own account of the situations.* **R. 3**.

In each of its decisions the Board detailed Dr. Savu's testimony and in its final decision, the Board stated that Dr. Savu "was very organized, prepared, and effective in defending many of

---

[7] While the AP found the Board's decision to be "clearly contrary to the evidence" because the Board did not assess the "appropriate credibility factors," he neither identifies "appropriate credibility factors" nor applies such factors in his own analysis. R. 2-8.

her clinical decisions relevant to the cases in question. Often time, she had literature citations that she based her decisions on." R. 23. The Board also found that Dr. Savu was "very effective in citing facts that the agency didn't include in their case file." R. 35.

The Board's decisions also show that the VA rarely objected to or contradicted Dr. Savu's testimony and that in at least one case she "provided details, events and dates that were compellingly closer to the facts." R. 36. Moreover, the VA had the burden of proof at the DAB hearing. R. 45. Thus, Dr. Savu had no need to prove her case.

The AP does not make any connection between Dr. Savu's presentation of evidence and his conclusion that the DAB's decision was clearly contrary to the evidence. He merely states that she did not "provide compelling evidence to support the interpretation more favorable to her" and that she did not provide documentation "independent of her own account of the situations." R. 3.

**E. Reason Six:** *As the Board's decision is clearly contrary to evidence, I do not concur with the Board's findings regarding the charges, as outlined below*[.] **R. 3-8.**

In cases four, five, thirteen, and twenty-eight the AP applied his own reasoning to each case rather than showing how the DAB's decision was clearly contrary to the evidence. The AP concurred with the Board's findings in cases thirty-six and forty-one. The AP's disagreement with the Board's decision in case nine is discussed in Subsection B, above.

In case eight, the AP found that the Board did not consider the testimony given by Drs. Perry and Nicholl. R. 5. In the final decision, the Board credited Dr. Nicholl's testimony, synthesizing it with Drs. Savu and Bower's testimony and checking all of the testimony against the knowledge of Dr. Pisegna, a board member who is a subject matter expert in obesity management. R. 13, 19.

The Board did not reference Dr. Perry's testimony. The decision states that "the issue of follow up for this case was not addressed in any testimony." R. 28. Assuming "surveillance of the

Barrett's esophagus" is "follow up"[8] Dr. Perry testified briefly that there was no plan for the surveillance of the Barrett's esophagus and he thought that was "quite problematic" R. 60. The Board commented that the reason given for this surgery being designated as a specification case was the "plan care" but they had no way of confirming the plan care outside of the testimony because the medical records were not provided. R. 19.

While the AP aired his disagreement with the Board's decision and observed one discrepancy, he did not show how the Board's decision clearly conflicts with the weight of the evidence presented at the DAB hearing.

**F. The AP must apply the clearly contrary to the evidence standard when reviewing a decision of a Disciplinary Appeals Board.**

The VA agrees that "controlling law and VA policy" permit reversal of a Board decision "if the decision is clearly contrary to the evidence." R. 3. The statute provides that only major adverse employment actions that involve or include "a question of professional conduct or competence" may be appealed to a Disciplinary Appeals Board, and the Board's decision may be reversed "if the decision is clearly contrary to the evidence." 38 U.S.C. §§ 7461, 7462(d).

Major adverse actions that do not involve professional conduct or competence are resolved applying grievance procedures. *Id.* § 7463. These procedures include a right to (1) "formal review by an impartial examiner"; (2) "prompt report of the findings and recommendations by the impartial examiner"; and (3) "prompt review of the examiner's findings and recommendations by an official of a higher level than the official who [made the decision]." *Id.* § 7463(d). This official may "accept, modify, or reject the examiner's recommendations." *Id.* In contrast to § 7462, there

---

[8] The record supports this assumption. *See* R. 13 (in which the Board finds: "The lack of follow-up planning for Barrett's esophagus was agreed upon by both reviewers, but, the 2 surgeons *gave* different *level* of ratings for the follow-up issue: Bower= II and Nicholl = III.").

10

is no standard of review in § 7463 that must be applied when accepting, modifying, or rejecting the examiner's recommendations.

It is apparent Congress intended to limit the ability to reverse the decision of a DAB by requiring application of the "clearly contrary to the evidence" standard of review set forth in § 7462(d). Merely parroting the standard without showing its application renders review of a DAB decision arbitrary and capricious. *See* 38 U.S.C. § 7462(f); *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). The statute requires application of the standard, not regurgitation of the statutory text. *See* 38 U.S.C. § 7462(d). To permit otherwise would effectively render § 7462(d)(2) meaningless.

## IV. CONCLUSION

For the foregoing reasons, the Court **FINDS** that the Acting Principal Deputy Under Secretary for Health did not apply the clearly contrary to the evidence standard when reversing the Disciplinary Appeals Board's decision. The Court **GRANTS** the *Petition for Judicial Review* (ECF No. 1), **VACATES** the Acting Principal Deputy Under Secretary for Health's decision, and **REMANDS** the matter for further proceedings consistent with this opinion. Defendant's motion to affirm (ECF No. 34), incorrectly filed as a motion for summary judgment, is **DENIED**. **The Clerk of Court is DIRECTED to close this case.**

**It is so ORDERED this 26th day of April 2021.**

_____
**JASON PULLIAM
UNITED STATES DISTRICT JUDGE**